[No. 29285. Department One. July 18, 1944.]

D. W. YOCKEY, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

*Griffin & Gershon*, for appellant.

*The Attorney General* and *L. E. O'Neill, Assistant*, for respondent.

JEFFERS, J.—Claimant, D. W. Yockey, was injured on November 27, 1938, while engaged in extrahazardous employment at Coulee Dam, being at the time employed by Consolidated Builders, Inc. The workman's report received by the department of labor and industries at Olympia contained the following: "I fell on my face on concrete. (I was climbing on steel and slipped and fell about 40 ft. landing on my face.)" The doctor's report, which is a part of the same form on which the workman's report is made, shows the following injuries to have been received by claimant: Multiple fractures face, mandible, maxilla nose, teeth, lacerations, and deformity.

On November 5, 1941, Mr. Yockey was examined by Dr. H. Eugene Allen, whose report concludes as follows:

"This man is carrying on a regular occupation. No further treatment is indicated. He has reached a fixed condition. For the injury to the bones of the face and the

[1]Reported in 150 P. (2d) 680.

fractured jaw resulting in deformity of both the upper and lower jaw with the resulting inability to get proper occlusion of his teeth and interfering with proper mastication and for the impaired sensation of the left side of the face above described, he should receive a P. P. D. of 20% of the maximum allowed for unspecified injuries."

On November 19, 1941, Mr. Yockey's claim was closed by the supervisor, with an award of $480 for permanent partial disability. Claimant filed an application for rehearing before the joint board. The application was sworn to on December 11, 1941, and states in substance that at the time of the application claimant was suffering from numerous disabilities in his head, teeth, eyes, ears, sense of taste, sense of smell, sinuses, neck, and nervous system; that prior to the accident he was in the best of physical condition, and was suffering from none of the disabilities therein set forth. The application was granted, and the first hearing before the joint board was held February 5, 1942. At this hearing the following witnesses were called by claimant and testified: Mr. and Mrs. Yockey, John R. Johnson, Harold F. Severson, and Dr. Ernest A. Rickards.

Mr. Yockey testified that he was twenty-nine years old, married, and had three children; that he was a steel worker by trade. He then described the accident and his treatment following the accident at the Mason City hospital, where he was confined about twenty-eight days. He testified that he did not return to work for about six months, and then worked only one day, when he was ordered off the job by the doctor.

It appears from claimant's testimony that he has been given a great deal of medical and dental attention, including some plastic surgery by Dr. Schriner of Seattle, in an endeavor to correct, in so far as is possible, the effects of the injuries received.

Mr. Yockey further testified that he had no sense of balance; that he was bothered with the sinuses all the time, with headaches up into the ear and nose; that his left eye was practically useless, being all blurred; that his ears ran all the time; that he could not hear out of the left ear as

well as he used to, or the right ear either; that the left ear was worse than the right; that he had ringing and popping in his ears all the time. He stated that his jaws locked, especially when they got cold, and it would take a minute to get them unlocked, and that when he did get them unlocked they would snap and then he would bite himself; that the jaws were out of line. He testified that he had a large depression in the left side of his face and that there was no feeling on the left side of his face; that he could not taste and could not smell; that he had colds all the time; that he could not climb, on account of his sense of balance; and that he could neither drive nor buck rivets. Claimant further testified that since his injury he worked on the Narrows bridge, in the Lake Washington shipyard, and is now working an eight hour shift at Boeing's, where he receives $1.55 per hour.

Mrs. Yockey's testimony generally corroborated that of her husband.

Mr. Johnson, who was working with claimant at Coulee Dam and saw him fall, testified that Mr. Yockey was a good workman; that he last worked with him in September, 1940 (apparently on the Narrows bridge); that claimant was wobbly and complained of his head.

Mr. Severson stated that he was a structural foreman, and had known claimant about six months, during which time Mr. Yockey had worked under his supervision about three and one-half months on different jobs; that, from his observation of claimant on the jobs, he believed claimant had lost his equilibrium; that he complained of headaches. The substance of this witness's testimony was that Mr. Yockey could not now do many of the things which a structural iron worker is expected to do, especially where his work requires him to be off the ground.

Dr. Rickards, who examined claimant on January 31, 1942, after stating that claimant had related to him the history of the accident and his subsequent treatment, further testified that, based upon such history and his examination, he would rate claimant as follows:

"I would rate this man on the loss of his balance, the head condition and the dizziness and blurring of the eyes and the buzzing in the ears and the nervousness—this is due to concussion of the brain, at thirty three and a third per cent of the unspecified. Then for the deformity of the jaws and the loss of his teeth and loss of sensation, thirty three and a third per cent of the unspecified and for the frequency of colds and the effect of a partial loss of smell and taste, twenty-five per cent of the unspecified. His injury to the neck, ten per cent of the unspecified and ten per cent for the miscellaneous or unspecified for the pain and discomfort he has from where the cartilage on the right side has' been removed he has considerable pain and discomfort which is reflected down his leg from his abdomen."

The doctor was asked why he grouped the loss of sense of balance and claimant's complaints of headaches, dizziness, blurring of his eyes, and ringing of his ears into one unit, and his answer was:

"A. Due to the concussion of the brain which he received at the time of the accident. Q. Are those all residuals of concussion? A. Yes. . . . Q. How do you account for his complaints of frequent colds? A. From the injury to his nose to a large extent and his lowered resistance as a result of this accident."

During the cross-examination of the doctor, the following questions, among others, were asked and answered:

"Q. You spoke of the zygoma or the zygomatic process— what's that? A. A bridge of bone. Q. The cheek bone is it? A. The cheek bone, the upper part of the cheek bone there. Q. Doctor, all these fractures he has had are healed are they not? That is, there are no ununited fractures? A. The lower jaw does not present a particularly healthy appearance. The bones have to some extent healed but the left antrum of Hymore there—that's in the jaw here on the left side—that has been badly depressed. Q. That's the antrum under the eyes? A. Leading to the eye—the Antrum of Hymore. Q. That was doubtless crushed or broken at that time? A. Yes. Q. And that presents not a perfect condition, that is, it has been depressed and possibly the shape of it changed? A. The whole outline of his face has been changed. It is a very unnatural condition that it has made."

The doctor also testified that the jaw was so irregular that he did not think it possible to get dentures that would fit properly.

"Q. You gave him thirty-three and a third per cent of the unspecified of eighty degrees for the condition of his ears and eyes—that was grouped together? A. I gave him thirty-three and a third per cent of the unspecified for head, dizziness and blurring of his eyes and ears and nervousness—yes that was the first award. Q. And you did not make any particular examination of his ears and eyes to determine just what amount of deafness he had in each ear or loss of sight in each eye? A. There was not any attempt to correct the loss of sight—no, I didn't attempt that. I think that as a matter of history of the blurring and also the matter of the hearing, he complains his hearing is not as good as it was and he is very nervous. That is included in that. Q. And the other thirty-three and a third per cent for the loss of his sense of balance, as you put it? A. Yes that was his first thirty-three and a third per cent. They were all grouped together in the first thirty-three and a third. Q. What is the next one for? A. The next thirty-three and a third per cent for the deformity of the jaws, loss of teeth, loss of sensation—that was the second thirty-three and a third per cent. Q. What was the twenty-five per cent you gave him for, Doctor? A. That was for the frequency of colds and the impairment of the sense of smell and taste. Q. And you had two other items there, each of ten per cent? A. One was for injury to the neck and the last one was for the pain and discomfort that he has from where the cartilage was removed on the right side along the lower edge of the ribs. Q. These were all relative to what is spoken of in the law as the eighty degrees maximum for the unspecified disability, is it not? A. The way I have rated this, I have rated from the conditions I have found. Q. It all refers to the eighty degrees maximum award for unspecified disability, does it not? A. *It is for unspecified disability.* Q. How much does that all add up to altogether? A. The eighty degrees, I am not rating—I am rating what I believe to be his condition. Q. What would that be? A. That would be—let's see,— Q. That would be seventy and two-thirds and twenty five and two tens—that would be a hundred and twenty per cent of the maximum? Doctor, do you think that is all?" (Italics ours.)

On redirect examination, the doctor was asked:

"Q. You have not attempted to rate him for loss of vision? A. No. Q. Or loss of hearing as such? A. No, I have not."

It will be noticed that Dr. Rickards did not attempt to reduce to degrees the per cent of unspecified. We shall later refer to the testimony of Dr. Rickards in discussing the maximum award which may be made for unspecified disability under the statute.

At a continued hearing held April 10, 1942, Dr. Alvin R. Miller, an eye, ear, nose, and throat specialist who had examined claimant on February 9, 1941, was called by Mr. Yockey and testified. The doctor, after describing the history of the accident and subsequent treatment as related to him by claimant, further testified that there was "dry, thick material on the canal wall of the left ear," and

"Nose: Septum is deviated to the left and airways on both sides is inadequate. Mucus membrane is pink and has a slight secretion covering it. Left antrum dark to light transmission and right transmission shows some light. Throat: Tonsils are out. Teeth: *Upper and lower plates have good occlusion.* Face: The left side of the face is caved in at the lower border of the maxilla. Tissue over the broken zygoma and maxilla is atrophic." (Italics ours.)

The doctor explained that the maxilla is that portion of the face below the eye and extending over the ear, and the zygoma is the cheek bone, which is part of the maxilla. Describing claimant's condition, the doctor further stated:

"The skin of the left side of the face is insensitive to touch. Scar over the left side of the nose. . . . Anterior line of the nose curves to the right. Scar over left eyebrow . . . multiple scars on the left side of the chin. . . . Eyes: Pupils react to light easily. The fungi of both eyes are without irregularity. The lower lid of the left eye is pulled down and outward and without eyelash. Cornea of both eyes are sensitive to touch. Vision without glasses: Left eye 20/40 minus 1. Right eye 20/30 minus 3."

The doctor then went into a technical discussion of the eyes and ears and the instruments used in making examina-

tions. He summed up his findings in regard to the claimant's eyes and ears as follows:

"It is my opinion that the visual complaints of the patient are due mostly to the astigmatism but partly to a tendency of the eye [left eye] to be more dry than normal because of the pulling down of the lower lid and the lack of lashes on this lid. The deafness, found to be conductive type in the right ear and conductive and perceptive in the left ear, is due to some trauma to the internal part of the left ear or the internal ear, and to the physiology and anatomy of the nose and middle ears, both right and left sides."

The doctor further testified that there was about twenty-five per cent loss of vision in the left eye as compared to the right, and fifty per cent loss of hearing in both ears.

The result of a 20/40 minus 1 vision in the left eye and 20/30 minus 3 in the right is dependent upon the ability of a patient to read certain letters on a certain line of a Snellen chart. An endeavor was made to have the doctor state just what 20/40 means; that is, whether it means that one can only read at twenty feet what he is supposed to read at forty feet. The doctor's answer was: "Well, my definition of 20/40 is that he can read at one-half of infinity." He further stated that 20/20 was supposed to be infinity. The doctor was then asked:

"Q. And how much in percentage, Doctor, do you consider 20/40 to be as compared to 20/20, that is, what percentage of loss of vision? A. I would say it represents a 25 per cent difference. Q. A 25 per cent loss of vision? A. Yes. Q. And 20/30, Doctor, that is the vision of the right eye, what percentage of loss of vision does that represent? A. That would represent 33 per cent—no, let's see. 20/40 would be 50 per cent loss of vision and 20/30 represent 33 per cent loss of vision."

The doctor was asked the following question:

"Q. And you think he ought to have an operation for the purpose of straightening the septum and enlarging the air space in his nose for the purpose of not only correcting that but preserving the hearing he still has? A. I think this septum should be operated on and placed back into center of the nose and that the operation should also take cognizance of the fact that the tissues have compensated for the

change in place *and I feel that I would be in the best position to get the best results.* I myself would be in a position to operate and get the best results." (Italics ours.)

Dr. Miller made no examination of claimant other than as to his eyes, ears, and nose.

At a continued hearing held September 11, 1942, Dr. Joe Brugman, who, together with Dr. Louis H. Edmunds, examined claimant on May 12, 1942, was called by the department. Dr. Brugman stated that he had practiced medicine and surgery for thirty-two years, and had treated a large number of industrial accident cases; that he had examined claimant at various times. The doctor, after stating the history of the case as related to him by claimant, was asked the following question:

"Q. Was his neck normal in appearance and motion? A. Yes. Q. And, Doctor, did you examine the X rays in connection with this injury? A. Yes, they showed a fracture of the lower jaw near the symphisis which was in the midline. Q. Doctor, based on your examination of this man and his complaints and the history given you, and the knowledge received by you from your examination, what conclusions did you come to relative to this particular injury, and the resulting disabilities, if any? A. There was a malalignment of the inferior and superior maxilla and a deformity resulting. And we recommended an award of thirty per cent of the maximum allowed for unspecified disabilities or *twenty-four degrees,* and for the loss of the seventh rib we recommended an award of five per cent of the maximum alloyed for unspecified disabilities or *four degrees.*" (Italics ours.)

It will be noted that the doctor, in arriving at the twenty-four degrees and four degrees, did so by taking thirty per cent of the maximum of eighty degrees and five per cent of eighty degrees, respectively. In other words, it is apparent that the doctor was of the opinion that eighty degrees represented the maximum disability under permanent partial disability.

Dr. Francis A. Brugman, an eye, ear, nose, and throat specialist who had examined claimant on May 12, 1942, was also called by the department. The substance of his testimony was that claimant had a vision in his right eye of

20/25, but this could be corrected to 20/20, and that he had a vision in the left eye of 20/30, which could be corrected to 20/20. We assume this correction could be made by glasses. The doctor's conclusion was that there had really been no loss of vision, but that the injury to the left orbit was responsible for some subjective symptoms, such as irritation and pain, things which cannot be seen. He further testified that, while there was no inflammation or perforation of the ear drums, the hearing in the right ear was slightly reduced, and in the left was considerably reduced; that in his opinion the deafness was due entirely to catarrhal trouble, which originated in the nose and was probably aggravated by the injury.

At a continued hearing held October 29, 1942, Dr. Louis H. Edmunds, who, as above stated, with Dr. Joe Brugman examined claimant on May 12, 1942, was called by the department. Dr. Edmunds, referring to the injuries resulting from the accident of November 28, 1938, stated that at the time of his examination Mr. Yockey complained of a deformity to his face, with numbness on the left side, and that his dentures did not fit. It was with reference to these complaints that the doctor's examination was made. The doctor testified that X rays on file were examined and showed a fracture of the lower jaw at the point of the chin; that the X rays showed the fracture united and the position fair; that the dentures claimant was wearing did not occlude properly and his recommendation was that claimant be furnished new dentures and that he be given a permanent partial disability award of thirty per cent of the maximum allowed for unspecified disability, or twenty-four degrees; that this award was recommended for the malalignment of the inferior and superior maxilla and deformity resulting; that he did not feel that this condition of the jaws could be improved, other than by the fitting of new dentures. The witness also testified that the doctors recommended five per cent, or four degrees, of unspecified permanent partial disability due to failure of the union after the removal of the cartilage for the plastic on the face.

The joint board, on November 30, 1942, entered an order closing the claim and awarding to claimant the total sum of $1,429.80. This award was made upon the following basis: Permanent partial disability to his head, $720, less previous permanent partial disability award of $480, or an additional award of $240; an award of $253.80 for permanent partial disability to his right eye; an award of $457 for permanent partial disability from loss of hearing of twenty per cent in both ears; or an additional award of $950.80 to be made at that time. (The correct total of the above figures is $1,430.80, but the amount stated in the order is $1,429.80.)

Claimant appealed from the order of the joint board to the superior court for King county. The cause came on for hearing before the court and jury on June 14, 1943, on the record made before the joint board.

While no error is based upon the giving or refusal to give any instruction, and therefore the instructions given became the law of the case, we set out instruction No. 15, for the purpose of showing the form of the verdict:

"This is a civil action and requires only ten of you to agree upon a verdict. Your verdict in this case will not be in the usual form, but will be in the form of answers to the following interrogatories:

INTERROGATORY No. 1.

"Did the department of labor and industries correctly rate the plaintiff's disability in the sum of $1429.80?

"ANSWER: ............................................

"Your answer to the above interrogatory must be 'yes' or 'no.' If your answer to this interrogatory is 'yes,' you need not answer the following interrogatory, but if your answer is 'no,' you will answer the following:

INTERROGATORY No. 2.

"What amount in addition to the $1429.80 already paid to plaintiff should be awarded to him for permanent partial disability?

"ANSWER: ............................................"

The answer of the jury to interrogatory No. 1 was no, and the answer to interrogatory No. 2 was $2,900.

After argument of counsel as to the form of the judgment and the amount which could be awarded in this case, the

court on September 11, 1943, entered judgment on the verdict, but reduced the amount found by the jury to $970.20, undoubtedly on the theory, as indicated by the court's statement, that the maximum which could be allowed to one classified as suffering permanent partial disability resulting from unspecified injury or injuries received in one accident was $2,400, and that, as claimant had been awarded $1,429.80, the most the jury could have allowed him was an additional $970.20, for which amount the court entered judgment.

Claimant has appealed from the judgment entered, and assigns error upon the refusal of the court to enter judgment in the amount of and upon the verdict, and in reducing the verdict to $970.20.

It is admitted by counsel for the respective parties that the solution of the question presented depends upon an interpretation of Rem. Rev. Stat., § 7679 [P. C. § 3472], subsection (f), which provides:

"Permanent partial disability means the loss of either one foot, one leg, one hand, one arm, one eye, one or more fingers, one or more toes, any dislocation where ligaments were severed where repair is not complete, or any other injury known in surgery to be permanent partial disability. For the permanent partial disabilities here specifically described, the injured workman shall receive compensation as follows:

"LOSS BY AMPUTATION: . . ."

Then follows a list of thirty-two different amputations for which specific awards shall be made, the greatest award being $3,000 for amputation of a leg so near the hip that an artificial limb cannot be worn, and the same amount for amputation of an arm so near the shoulder that an artificial arm cannot be worn.

Following the list of "Loss by Amputation" is a list of "Miscellaneous." Under this list is placed

"Loss of one eye by enucleation........... $1,440
"Loss of sight of one eye.................. 1,080
"Complete loss of hearing in both ears..... 2,280
"Complete loss of hearing in one ear....... 600
"Complete broken arch in foot............ 600"

Following the miscellaneous list is a paragraph providing for unspecified disabilities, that is, any permanent partial disability not specified above, and this is the portion of the section with which we are most concerned, as it is admitted that the disability here claimed as the result of the accident falls within the class of unspecified. This paragraph provides:

"*Compensation for any other permanent partial disability* shall be in the proportion which the extent of such other disability shall bear to that above specified, which most closely resembles and approximates *in degree of disability* such other disability, but not in any case to exceed the sum of two thousand four hundred dollars ($2,400.00): Provided, That for an ankylosed joint the award shall not exceed thirty (30) per cent of the specified amount for the amputation of the member at the disabled joint: And provided, further, That for disability to a member not involving amputation, not more than three-fourths (¾) of the foregoing respective specified sums shall be paid. Provided, further, That payment for any injury to minor hand or arm or any part thereof, shall not exceed ninety-five (95) per centum of the amounts hereinbefore enumerated." (Italics ours.)

It will be noticed that the paragraph last above referred to does not say that a claimant may receive up to $2,400 for each and every *injury* because of which he is classified as permanently partially disabled, but that he shall not receive in excess of $2,400 for any unspecified permanent partial *disability*.

It is appellant's contention that, where a person receives a permanent partial disability classification as the result of unspecified injury to different parts or organs of his body in one accident, under the unspecified provision such claimant may, if the evidence so warrants, be entitled to an award for each member, organ, or part of the body injured up to a maximum of $2,400; that a claimant is not limited by the statute to a maximum of $2,400 for all unspecified injuries received; and that, therefore, under the evidence herein, the jury was warranted in rendering a verdict for $2,900 in addition to the $1,429.80 awarded by the joint board. Appellant states in his brief:

"We think the limitation in the statute 'but not in any case to exceed the sum of $2,400.00' simply and only means that a permanent partial disability to the neck, for instance, cannot exceed $2,400.00, or an injury to the heart cannot exceed $2,400.00."

The department's contention is that the maximum which can be allowed for permanent partial disability under the unspecified, resulting from one accident, is $2,400, regardless of the fact that several members, organs, or parts of the body may have been injured as a result of such accident; that it is the disability for which the award is made, based upon the injury or injuries received.

It must be admitted that the paragraph relative to unspecified disabilities is certainly not as clear as it might be, and a difficult question is presented to a court in making a proper award thereunder, and it would be more difficult for a jury, unless the jury be carefully instructed as to the meaning of the statute and the maximum award which can be made. We frankly state that, from an examination of the record, we are at a loss to understand how or upon what basis the jury arrived at their verdict. The testimony of Dr. Rickards was based upon a percentage of unspecified, as was that of Dr. Miller. Neither of these doctors reduced these percentages to degrees of disability, nor does their testimony indicate that they recognized that eighty degrees represented the maximum for unspecified permanent partial disability. Drs. Brugman and Edmunds reduced their testimony to degrees of disability, apparently believing that eighty degrees represented the maximum for unspecified permanent partial disability.

By instruction No. 3 the jury were informed:

"Included in unspecified permanent partial disabilities are injuries to the eye which do not result in the loss of sight and injuries to an ear or ears which do not result in a complete loss of hearing. The workmen's compensation act further provides that compensation *for any other permanent partial disability* shall be in the proportion which the amount of such other disability shall bear to that above specified which most closely resembles and approximates *in degree of disability* such other disability but not in any

case *where the injuries are such as are disclosed by the testimony herein to exceed the sum of $2,400."* (Italics ours.)

The main question to be determined may be stated as follows: May an award be made in excess of $2,400 for permanent partial disability as the result of unspecified *injuries* received in one accident? By unspecified we mean where permanent partial disability is awarded for injuries other than those listed under "Loss by Amputation" or "Miscellaneous."

This question seems to be one of first impression in this state, nor have we been able to find where it has been passed upon by any of the other states having a workmen's compensation law.

There can be no doubt that the question is an important one, as it is apparent from Dr. Rickards' testimony that, if an award of the maximum of $2,400 for each unspecified member or organ injured in one accident can be made, the total of such awards for permanent partial disability might far exceed the amount allowed under the statute for total permanent disability. It may be argued that this is no concern of the court, but we think it is a fact which must be considered in arriving at a determination of what the legislature intended could be awarded for unspecified permanent partial disability.

The original act relating to compensation for injured workmen will be found in Laws of 1911, chapter 74. Section 5, subsection (f), p. 360, of that act provides in part as follows:

"Permanent partial disability means the loss of either one foot, one leg, one hand, one arm, one eye, one or more fingers, one or more toes, any dislocation where ligaments are severed, or any other injury known in surgery to be permanent partial disability."

The definition of permanent partial disability in the 1911 act is the same as that found in Rem. Rev. Stat., § 7679, except that the present act contains the following words "where repair is not complete," limiting the clause "any dislocation where ligaments were severed."

The 1911 act continues:

"For any permanent partial disability resulting from an injury, the workman shall receive compensation in a lump sum in an amount equal to the extent of the injury, to be decided in the first instance by the department, but not in any case to exceed the sum of $1,500.00. The loss of one major arm at or above the elbow shall be deemed the maximum permanent partial disability. Compensation for any other permanent partial disability shall be in the proportion which the extent of such disability shall bear to the said maximum."

We think it is apparent that under the 1911 act the most that a workman could receive for a permanent partial disability under that part of the act which provided "compensation for any other permanent partial disability shall be in the proportion which the extent of such disability shall bear to the said maximum," was $1,500, regardless of the number of injuries to separate parts of the body. In other words, it was the *disability* caused by such injury or injuries for which the award was made, and, so long as a man was classified as permanent partial disability, the most he could receive was $1,500.

The first case to come before this court involving the 1911 act was *Biglan v. Industrial Ins. Commission,* 108 Wash. 8, 182 Pac. 934. In that case, Biglan sustained an injury to his right eye in 1913, for which he received a permanent partial disability award of $625. While still engaged in extrahazardous employment in 1916, Biglan sustained an injury to his right arm for which he was classified as permanently partially disabled, and the commissioner allowed him $1,250 for the disability resulting. Upon discovering that Biglan had theretofore received a permanent partial disability award, the commissioner canceled the award of $1,250, and made an award of $875, being the difference between the $1,500 maximum and the $625 awarded to Biglan for the first injury. Biglan appealed to the superior court, and from an unfavorable decision there appealed to this court, urging that under the act of 1911 there could be more than one permanent partial disability which would entitle

a workman to receive awards aggregating in excess of $1,500. This court affirmed the judgment of the trial court and the decision of the commissioner. In the cited case, we recognized that compensation awarded under the act was not designed to award full compensation, but is only a system of limited insurance whereby all industrial employees within the statute are paid definite but limited amounts for injuries, without regard, as we have said, to the particular individual circumstances or needs of the injured employee.

The cited case is not very helpful herein, except that it is an indication that, where there were no specified injuries, and the law provided for a maximum for permanent partial disability, this court was of the opinion the total award for permanent partial disability could not exceed the maximum, regardless of the number of injuries.

By Laws of 1917, chapter 28, p. 81, § 1, subsection (f), the legislature for the first time specified certain amounts to be paid for certain injuries because of which a person was classified as permanently partially disabled. This section contained the same definition of permanent partial disability as that contained in Rem. Rev. Stat., § 7679, *supra*. The 1917 act contained a list of some nine injuries for which specific awards were to be made, the highest of which was $2,000 for loss of a leg by amputation so near the hip that an artificial limb could not be worn. The list also included loss of major arm at or above the elbow, $1,900; loss of one eye by enucleation, $1,200; loss of sight of one eye, $900; complete loss of hearing in both ears, $1,900; complete loss of hearing in one ear, $500.

The 1917 act also contained the same provision as to unspecified disabilities as is contained in Rem. Rev. Stat., § 7679, except that the maximum for unspecified under the 1917 act was $2,000. The 1917 act did not contain the following provision which is found in the 1911 act: "The loss of one major arm at or above the elbow shall be deemed the *maximum permanent partial disability*." (Italics ours.)

Counsel for the respective parties both cite the case of *Klippert v. Industrial Ins. Dept.*, 114 Wash. 525, 196 Pac. 17. This case was decided after the 1917 act became effective.

The awards made in the cited case in each instance were for specified permanent partial disabilities, and not for disabilities resulting from unspecified injuries. In that case, Klippert, while engaged in extrahazardous employment in 1917, received an injury which resulted in the loss of an eye by enucleation. He was given a permanent partial disability award of $1,200, as specifically provided by the 1917 and 1919 acts. In 1919, he received another injury which resulted in the loss of the major arm at the shoulder. Klippert contended that for the disability caused by this second injury he should receive $1,900, as provided by the statute, while the department contended he was entitled only to the difference between $2,000, the maximum provided for unspecified disabilities, and the $1,200 awarded for the first injury. In other words, the department claimed that $2,000 was the maximum that could be awarded for specified permanent partial disability, even though claimant had been so classified as the result of injuries received in different accidents. We held that as to specified disabilities the law was mandatory and could not be enlarged or contracted beyond its express terms, and that claimant was entitled to an award of $1,900 as specifically provided by the statute. In the cited case, while the court held that the statute was mandatory as to specified disabilities, it had this to say of the unspecified:

"This maximum of two thousand dollars clearly relates to nothing else than *an unscheduled disability* which may be rated by the commission as a permanent partial disability." (Italics ours.)

It will be noted that the court did not say unscheduled injury, but *unscheduled disability.*

In *Harrington v. Department of Labor & Industries,* 9 Wn. (2d) 1, 113 P. (2d) 518, we had this to say of the *Klippert* case:

"The *Klippert* case merely held that Rem. Rev. Stat., § 7679. [P. C. § 3472] (f), which defines permanent *partial* disability, was intended to provide for specific awards for each of the types of injury therein enumerated, and that recovery for a particular disability mentioned in the statute

did not preclude subsequent recovery, in the full amount specified in the statute, for *a later injury which was separate and distinct from the previous one, and which resulted in further permanent partial disability.*" (Italics ours.)

We also stated in the cited case that the theory upon which compensation is allowed to an injured workman is that such workman has sustained a loss of earning power, or capacity to earn money.

The *Klippert* case is the only case cited by appellant to sustain his contention. We are unable to see where the case is applicable to the facts herein presented, in so far as appellant is concerned.

It will be recalled that in the first part of this opinion we referred to eighty degrees as representing the maximum unspecified permanent partial disability. In *Smith v. Department of Labor & Industries*, 180 Wash. 84, 38 P. (2d) 1016, the trial court reversed an order of the joint board and entered judgment awarding Smith $600 for a twenty-degree permanent partial disability. In referring to the judgment, we stated:

"The trial court found respondent disabled to the extent of forty degrees (in other words, that he was fifty per cent disabled, a disability estimated at eighty degrees representing total disability), but that one-half of this disability was due to high blood pressure having no connection with the injuries which respondent had suffered, and that respondent was entitled to compensation from the state only to the extent of twenty degrees."

In the cited case, Smith was unquestionably given a permanent partial disability rating for unspecified *injuries* which resulted from a fall. As a result of this fall, he claimed injury to his back, pain all the time, lameness in his right leg, and bladder trouble. In affirming the judgment of the lower court, we stated:

"It must be difficult at best for either the department or court to make an accurate appraisal of the extent of compensable disability in cases of this kind. The best that can be done is approximate justice. This *standard,* we think, is met by the finding of the trial court, and we do not feel justified in disturbing its award." (Italics ours.)

It seems to us the court in the cited case properly interpreted the statute relative to unspecified disabilities, and laid down a rule which should be followed in making awards under the provision of the statute here under consideration. In reaching its conclusion, the court said in effect that eighty degrees represents the maximum permanent partial disability which can be sustained for unspecified injuries, and for this maximum permanent partial disability the most that can be awarded is $2,400. Under this theory one degree of disability equals thirty dollars, or, stated another way, for each degree of unspecified permanent partial disability, up to the maximum of eighty degrees, a workman, in a proper case, is entitled to thirty dollars.

In arriving at the ultimate number of degrees of disability suffered by a workman, the court or jury may take into consideration all the unspecified injuries the workman may have received as the result of an accident; however, in making the award, it must be limited to and based upon a maximum disability of eighty degrees and a maximum award of $2,400.

In the instant case, we are concerned only with unspecified permanent partial disabilities resulting from one accident.

In the case of *Litke v. Department of Labor & Industries,* 2 Wn. (2d) 536, 98 P. (2d) 981, we again recognized that eighty degrees represents the maximum unspecified permanent partial disability, at thirty dollars per degree.

In view of the fact that the maximum award for permanent partial disability which could be made to claimant for unspecified injuries resulting from one accident was $2,400, and in view of the further fact that appellant had been awarded $1,429.80 for the disability resulting from such injuries, it is apparent that the highest award the jury could make in this case was $970.20 additional.

In view of the above facts, we are of the opinion the trial court was justified in reducing to $970.20 the award made by the jury, and in entering judgment for that amount on the verdict. The effect of this judgment is that appel-

lant would actually receive an award of $2,400, the maximum allowed under the statute.

In conclusion may we say that we appreciate that appellant was severely injured in this accident, and that he has a facial disfigurement at least which probably can never be remedied. We also appreciate that no award in money can compensate appellant for the injuries received or the pain suffered, but we are limited by the terms of the statute and the awards therein provided for, and if the awards seem small or inadequate that is something which we have no power to correct.

For the reasons herein assigned, the judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, and STEINERT, JJ., concur.

GRADY, J. (dissenting)—My review of the legislation on the subject now before us leads me to a different conclusion from that reached in the majority opinion. After the workmen's compensation act was in operation for a time, it was quite generally recognized that the awards provided were in many instances inadequate and there developed a progressive tendency towards a broadening of the law and increasing its benefits. At first, the disability arising from a few enumerated injuries was defined as permanent partial disability as well as "any other injury known in surgery to be permanent partial disability." Later, other injuries were added to the list and a schedule of fixed awards provided. It was not practical and perhaps not possible to make an all-inclusive enumeration of injuries that would be deemed to constitute permanent partial disability, and so it was provided by chapter 209, Laws of 1941, p. 631, § 1 (Rem. Supp. 1941, § 7679), (f), that

"Compensation for any other permanent partial disability shall be in the proportion which the extent of such other disability shall bear to that above specified, which most closely resembles and approximates in degree of disability such other disability, but not in any case to exceed the sum of three thousand six hundred dollars. . . ."

In construing the act of 1911, we held in *Biglan v. Industrial Ins. Commission,* 108 Wash. 8, 182 Pac. 934, that no matter how many injuries a workman might receive resulting in as many permanent partial disabilities he could not be awarded anything beyond the fifteen hundred dollars total maximum provided for permanent partial disability. It is quite evident that the law was not satisfactory, because the legislature enacted chapter 28, Laws of 1917, p. 76, which not only made additional enumerations of injuries that would each constitute permanent partial disability, but a fixed amount was provided for each one. In response to the change made in the law, this court held in *Klippert v. Industrial Ins. Dept.,* 114 Wash. 525, 196 Pac. 17, that, if a workman suffered two injuries of the enumerated kinds set forth in the schedule, he was entitled to the fixed award provided for each disability resulting from each injury.

The kind of case we have before us is no different in principle from the *Klippert* case. We have a situation where the several separate injuries sustained, resulting in as many separate permanent partial disabilities, are not enumerated in any schedule, and consequently do not have a fixed award therefor. This part of the law provides that compensation for any other permanent partial disability shall be based upon a comparable enumerated injury set forth in the schedule, "but not in any case to exceed the sum of three thousand six hundred dollars."

It seems to me the fact that the various injuries sustained by the claimant are not enumerated in the schedule does not deprive him of an award for each one of them. What has to be done in a case of this kind, where a workman in one accident sustains a number of separate injuries and none of them are in the schedule, is to determine which of them are permanent partial disabilities, then go to the schedule and select the ones most comparable to those sustained by the workman and fix compensation therefor. The whole idea seems to be that, if a workman sustains an injury to any part of his person which causes a permanent partial disability, he is to be compensated therefor, and the amount of his compensation for certain enumerated injuries is set

forth in a schedule. But, if he sustains an injury that is not enumerated and it results in a permanent partial disability, he is to be compensated therefor in the manner provided, not exceeding the fixed maximum.

If in one accident or in separate accidents, he sustains several separate injuries not enumerated in the schedule, he should be treated and compensated from the same standpoint as if his injuries were enumerated in the schedule. I think the words "in any case" mean and refer to any one separate *injury* that results in a permanent partial disability rather than to any one *workman* who may be injured and as a result suffer one or more permanent partial disabilities.

I do not think it is for the court to consider what a badly injured workman might possibly receive, if he sustained several major injuries any one or all of which fell short of permanent total disability, in aid of the interpretation of the law. The schedule fixes a definite sum to be paid for each enumerated injury, but no fixed sum is provided for the others. A maximum is provided for each injury resulting in permanent partial disability, and in a severe instance the fact that collectively the allowance might be considerable is not any concern of this court.

I think there was sufficient evidence to go to the jury on the questions of fact and that its verdict should be allowed to stand.

September 5, 1944. Petition for rehearing denied.