[No. 29652. Department One. July 26, 1945.]

FRED C. SCHNEIDER, *Respondent*, v. WALTER NOEL et al., *Appellants*, J. A. CRIMP, *Defendant*.[1]

Cheney, Hutcheson & Gavin and Gordon Hanson, for appellants.

J. P. Tonkoff, for respondent.

STEINERT, J.—This action was instituted by the plaintiff to recover damages from the defendants for breach of contract and for conversion of property, following upon a

[1]Reported in 160 P. (2d) 1002.

transaction in which the defendants are alleged to have sold to the plaintiff a certain tavern business and the assets thereof.

The complaint alleged that on and prior to August 25, 1944, defendant Walter Noel was the owner of a certain tavern in Yakima commonly known as the Circle Inn, and that the defendant Fred Noel had some interest therein, his exact interest, however, being unknown to plaintiff; that on that day those two defendants orally agreed to, and did, sell the tavern to the plaintiff for the sum of $8,500; that the sale included all goods, wares, and merchandise in the tavern, together with all advanced water and light deposits, all liquor licenses relating to the operation of the business and all deposits made therefor, also the leasehold interest in the building in which the business was conducted and rentals paid in advance on the lease, and all equipment, signs, and other personal property connected with the business. The complaint further alleged that it was agreed that plaintiff's check for $8,500 should be held in escrow by defendants' attorney until such time as the Washington state liquor control board had transferred and issued to plaintiff the licenses required for the operation of the tavern; that pursuant to that agreement, and with the consent and authorization of the defendant Walter Noel, the liquor control board issued to the plaintiff a temporary permit enabling him to continue the operation of the business; that on August 26, 1944, Walter Noel delivered possession of the premises to the plaintiff; and that plaintiff operated the tavern for two days thereafter.

The complaint then charged that, while the liquor control board was in process of transferring the liquor licenses to the plaintiff, as theretofore agreed, the two defendants above named and the third defendant, J. A. Crimp, caused the liquor control board to cancel the transfer of licenses; that about the same time the defendants sold the business to one Genevieve Aiken; that the liquor control board, acting upon the defendants' notification and request, gave notice to the plaintiff that he could no longer operate the tavern; that, because of that situation, plaintiff temporarily

locked up the premises; and that, while the place was so closed, the defendants jointly and severally took possession of the tavern and subsequently opened, and have ever since operated, the business without plaintiff's consent. Finally, it is alleged in the complaint that the tavern and business were reasonably worth $12,000 and that plaintiff was damaged in the sum of $4,500.

Defendants in their answer denied each and all of the allegations in the complaint. Further answering, they alleged that the action had not been properly brought by the plaintiff, in view of the inhibitions of the statute of frauds and of the uniform sales act, no adequate consideration having passed between the parties, and no memorandum in writing with respect to the sale ever having been made; that none of the defendants presently had any right of ownership in the tavern, and that defendants Fred Noel and J. A. Crimp never at any time during the negotiations here involved had any interest therein.

In explanation of the transaction between the parties, the answer alleged that plaintiff attempted to purchase the tavern, together with all its supplies and equipment, for the sum of $8,500; that the offer was verbal and was made to the defendant Fred Noel acting as the agent of the defendant Walter Noel; that a check for $8,500 was offered to Fred Noel and, on his refusal to accept it, was left with the defendants' attorney, as an offer to purchase the tavern, provided assurance were given that all bills owing by Walter Noel would be paid in accordance with the bulk sales law, or that Fred Noel would give a written guaranty that all such indebtedness would be satisfied; that, as an integral part of the proposed sale and purchase, it was orally agreed between the parties that a written agreement would be executed covering the operation of certain pinball machines then located and being used in the tavern; that such written agreement was prepared, but that the plaintiff refused to sign it; that no bill of sale was ever executed by defendant Walter Noel and no transfer of lease or of utility deposits was ever executed by him; and that no

payment of the purchase price was ever made by the plaintiff to Walter Noel, the owner of the tavern.

The answer then alleged that the plaintiff took possession of the premises, together with all supplies and merchandise located therein, and operated the tavern for two days, until told by the Washington state liquor control board that he must close, since he had no license or permission to operate; that at all times pending the negotiations hereinabove referred to, the operation of the tavern continued under licenses held by Walter Noel, who paid and was responsible for all salaries, rentals, utility payments, and other expenses incidental to the business; that at no time were the beer and wine licenses transferred to the plaintiff; that no oral or written agreement was ever entered into between the parties respecting the sale or purchase of the tavern; that the terms of the tentative negotiations between the parties were never met by the plaintiff; and that plaintiff's operation of the tavern for the two-day period was without a license so to do and was in violation of both state and Federal laws.

Defendant Walter Noel further countered with a cross-complaint, included in the answer, alleging that, while in occupancy of the premises, plaintiff had sold certain merchandise belonging to Walter Noel and had received certain income from the business, for all of which an accounting was demanded.

The affirmative matter contained in the answer and cross-complaint was denied by the plaintiff, except in so far as it was not inconsistent with the allegations of the complaint.

The cause was tried to the court and jury. At the conclusion of plaintiff's evidence, defendants, challenging its legal sufficiency, moved for a dismissal of the complaint. The motion was denied. At the conclusion of all the evidence, defendants again moved for such dismissal. That motion was likewise denied as to the defendants Noel, but was granted as to the defendant Crimp. Plaintiff acquiesced in the dismissal of the latter-named defendant. The court then gave its instructions to the jury, to which fur-

ther reference will be made a little later herein, and the jury, after due consideration, returned a verdict against the two remaining defendants, Walter Noel and Fred Noel, in the sum of two thousand dollars. Defendants thereafter moved for judgment notwithstanding the verdict and, in the alternative, for a new trial, both of which motions were denied. Judgment was entered on the verdict, and the defendants Noel appealed.

The assignments of error are directed to (1) the denial of defendants' challenge to the legal sufficiency of the evidence and their motion for dismissal at the close of plaintiff's case; (2) the denial of defendants' motion for dismissal at the conclusion of all the evidence; (3) the denial of their motion for judgment notwithstanding the verdict; (4) the denial of their motion for new trial; and (5) the entering of judgment against the defendants Noel.

The evidence introduced by the respondent, and upon which the jury was warranted in returning its verdict under the instructions given by the trial court, was as follows:

Prior to August 23, 1944, appellant Walter Noel was the owner and operator of a tavern known as the Circle Inn, located in the city of Yakima. At the same time, his cousin, appellant Fred Noel, was the owner and operator of the Mayfair Tavern, which also was located in Yakima. Fred Noel was the older and more experienced of the two men and had financed and counseled his cousin Walter at the time the latter purchased the Circle Inn, in July, 1943. In both of these taverns were certain pinball machines which were owned by Fred Noel individually. Under an agreement between the Noels, the profits from the machines which were located and operated in the Circle Inn were divided equally between the two cousins. Defendant J. A. Crimp was the bookkeeper and accountant for both Fred Noel and Walter Noel. Genevieve Aiken, whose interest in the property here involved came into existence after the controversy between the litigant parties had come to a head as hereinafter related, is the sister of Fred Noel and the cousin of Walter Noel.

On Wednesday, August 23, 1944, respondent, Fred Schneider, having learned that the Circle Inn was for sale, and having made several hours' observation of its operations, called on Walter Noel and discussed with him the matter of a possible purchase of the business. Walter told him that "they" had another deal pending at that time, but if that did not materialize, "they" would be interested in selling to the respondent. On the following day, respondent returned, but nothing definite as to the other deal had as yet transpired. At that same time, however, Walter Noel told the respondent that "the man to really see on it was Fred Noel." Respondent then communicated with Fred Noel by telephone and arranged for a meeting with him at the Mayfair Tavern on the afternoon of the next day, Friday, August 25th. Accompanied by his father, C. B. Schneider, respondent kept the appointment as agreed. After some discussion at that time, Fred Noel stated that he would let them have the place for $8,500, the sale to include merchandise on hand and all prepaid expenses, such as rent, and all advance deposits for water, light, licenses, etc.

Having learned beforehand that the pinball machines in the Circle Inn belonged to Fred Noel, respondent and his father requested that Noel keep and maintain them there, to which Noel replied that he would be 'very happy to do so. Fred Noel was unable at that time to state the items or amount of prepaid expenses connected with the business and suggested that the Schneiders see J. A. Crimp, the bookkeeper, who would be able to give them the details. Later that afternoon, or possibly that evening, another meeting was held, at which were present Fred Noel, Mr. Crimp, C. B. Schneider, and the respondent. Further discussion was then had, particularly with reference to the information furnished by Mr. Crimp regarding the prepaid expenses.

The sale price of $8,500 having been agreed upon, the parties then discussed the matter of the time when the business was to be taken over by the respondent. Fred Noel stated that they, the Schneiders, could take over at

"almost any time," but that Walter Noel had some beer in the tavern and wanted to sell that out first. It was then agreed that respondent should take over on the following day, Saturday, as soon as Walter Noel had disposed of the merchandise which he had bought for that day's operation. At the same time, respondent offered to put up the $8,500 in escrow with Fred Noel's attorney, but Fred said that was not necessary.

In the meantime, respondent had procured from the state liquor inspector's office a form of application for transfer of the liquor licenses pertaining to the Circle Inn. At the conclusion of the second meeting referred to above, respondent, with his father, again called on Walter Noel at the Circle Inn and told him they had bought the place from Fred Noel. They then asked Walter to sign the form of application for transfer of the liquor licenses which respondent had procured that afternoon. Walter replied that he could not sign the application without first getting in touch with Fred Noel, inasmuch as he, Walter, had already sold the place to Fred, and it would therefore require the latter's approval. The explanation for that statement is, in part at least, that during the pendency of a former negotiation between Walter Noel and other prospective purchasers, Walter had given Fred Noel a bill of sale of the tavern, with the name of the prospective purchaser left blank. A similar explanation, made by Fred Noel to the Schneiders, was that Fred had taken the bill of sale from Walter, but the name of the purchaser was left blank therein, in order to obviate the necessity of having another bill of sale made by Fred Noel to his prospective purchaser. In other words, the original bill of sale was to cover two transactions, and under that arrangement respondent's name was to be inserted as the purchaser, as though from Walter Noel.

Because of his objection to signing the application for the transfer of the liquor licenses, upon the grounds as stated by him to the Schneiders, Walter accompanied them to the Mayfair Tavern to see Fred. The purpose of their call had beforehand been communicated to Fred by tele-

phone. Upon their arrival at the Mayfair, Fred Noel informed Walter that the deal with the respondent had been closed and that it was "O.K." for Walter to sign the application for the transfer of the licenses; Walter thereupon immediately signed the application. On that same day, or the next day, Walter Noel instructed the respondent to make out his check for $8,500 in favor of Fred Noel.

During these negotiations, the Schneiders had requested that the sale be consummated in accordance with the bulk sales law. After some discussion with reference to that matter, Fred Noel agreed to take care of all the outstanding indebtedness of the tavern. This was satisfactory to the respondent, and so the question of giving a bulk sales affidavit was dropped.

On Saturday morning, August 26th, respondent made application to the liquor board for transfer of the licenses and was told that it would require a money order or a certified check in the sum of ten dollars. Respondent procured and delivered a certified check in that amount and was then assured that, as soon as Walter Noel signed and delivered the application, the transfer would be made as a matter of routine. That afternoon, the respondent, his father, and Walter Noel called at the office of the liquor board and explained to the chief inspector the circumstances of the transaction, whereupon the inspector, being satisfied with the arrangement, granted respondent permission to operate the tavern, beginning the following Monday and continuing until the licenses could be formally transferred, at the main office in Olympia, from Walter Noel to the respondent.

During that same day, respondent completed arrangements with the various utility companies for transfer to his credit of the utility deposits which had been paid by Walter Noel; he also communicated with the state tax commission and signed the necessary papers for his future operation of the business; he also bought from Walter Noel, and paid him for, two cases of wine still left in the place.

On Saturday afternoon, August 26th, respondent by chance again met Fred Noel, and then tendered to him the

check for $8,500. Noel refused to accept the check at that time and, on being asked why, stated that he wanted "some kind of a written memo on the pinball machines in there . . . a memo stating that, as long as the equipment and the service is satisfactory, you [respondent] will use my machines, you will retain my machines." Respondent at first objected to signing such a statement, on the ground that it was not a part of the original agreement. He stated, however, that he would talk to his father about it, which he did that night. The understanding between respondent and Fred Noel on that occasion was that Mr. Crimp was to draw a memorandum, with reference to the pinball machines, incorporating therein the terms requested by Fred Noel as hereinabove quoted, and that the parties would then consider it further.

On that same afternoon, respondent met Walter Noel at the tavern, at which time Walter turned over the keys to the respondent and said: "Well, it's your baby now." Some of Walter's friends were present with him at the time, and after he had turned over the keys, he conversed with his companions "about celebrating the fact he was going out of business and going into a new field." Later that evening, respondent returned to the tavern alone and took inventory of the merchandise therein.

On the following day, Sunday afternoon, respondent and his father were in the tavern making ready to open up the place for business on Monday morning. While the Schneiders were so engaged, Walter Noel and Fred Noel came in and, during their stay, unlocked the pinball machines and checked their contents; at the same time, Walter collected and took possession of his personal belongings. At the same meeting, respondent told Fred Noel that he would sign a memorandum with reference to the pinball machines, as previously requested by Fred, that is, that respondent would retain and use Fred Noel's machines as long as the equipment was satisfactory. The memorandum had not as yet, however, been prepared by Mr. Crimp.

On Monday morning, August 28th, respondent opened the tavern and began business. He operated the tavern for two

days, with the same crew of employees as had previously worked therein for Walter Noel. During that period, Crimp prepared a written memorandum regarding the pinball machines. That memorandum contained, however, among other provisions, the following: "the right [in Fred Noel] to the continuous operation of pin ball machines whether the business is transferred [by respondent] or not." When the memorandum was submitted to respondent, he strenuously objected to the above provision, upon the ground that it was not what he had agreed to, and for the reason that such a provision might utterly prevent his sale of the tavern business in the future. He was perfectly willing to retain and use the machines as long as he owned or operated the tavern, but was unwilling to guarantee that they should remain there after he had sold the business.

On Tuesday night, August 29th, at ten o'clock, the appellants, Walter Noel and Fred Noel, came to the tavern and Fred Noel then peremptorily announced to the respondent:

"Well, either you sign that pinball agreement the way Crimp typed it out or we want you to close up, it's no deal, or we won't give you the place."

Respondent refused to sign the agreement, and appellants insisted that he close the place. Respondent then telephoned to the liquor inspector and was advised by him to cease operation immediately and to close the place until the matter of the license transfer was straightened out. Respondent at once complied with that demand. During the next few days the parties were attempting, with the aid of appellants' attorney, to iron out the difficulty, but without success. During that same period, respondent deposited his check for $8,500 with the attorney. In the meantime, the tavern remained closed. On August 31, 1944, the senior inspector of the Washington state liquor control board wrote the respondent a letter reading as follows:

"Mr. Walter Noel to-day requested that application for transfer of license to you be disregarded. This request is therefore being complied with and said application will not be given further consideration. Your check for ten dollars ($10.00) is enclosed herewith."

Since that time respondent has not operated, nor been permitted to operate, the tavern. A few days later appellants took possession of the premises, and in the following week Fred Noel sold the tavern to Genevieve Aiken, his sister, for $8,500 and had the liquor licenses transferred to her. Mrs. Aiken was at the time residing, and has since resided, with her brother Fred Noel. To assist her in making the purchase, Fred Noel loaned her the sum of $4,500.

Upon the question of damages sustained by the respondent, there was evidence to the effect that the tavern had regularly done a prosperous business; that its beer quota was unusually large; that the net profits amounted to one hundred dollars a day; and that the market value of the tavern as a going concern was fifteen thousand dollars.

We have thus far been relating the evidence introduced by the respondent. As may be expected, and as is suggested by appellants' answer, the substance of which has already been stated, the evidence introduced by the appellants was in some respects contrary to that of the respondent. Instead of setting forth at length appellants' evidence, however, we may say that it was in substantial support of their contentions and that it might have warranted a verdict in their favor had the jury chosen to believe and accept their version of the transaction. But, unfortunately for the appellants, the jury, acting upon the instructions given by the trial court, chose to believe the evidence adduced by the respondent and rendered its verdict in his favor, as it had the right to do.

This brings us to a consideration of the instructions given by the trial court, and we will say, in the beginning, that no exceptions whatever were taken by the appellants to any of those instructions, nor were any other instructions requested by them. Those circumstances have a determinative bearing upon the decision of this case. In view of the importance of the instructions, we deem it advisable to set forth the material portions thereof in the language of the trial court. They are as follows:

Instruction No. 3. "The burden is upon the plaintiff [respondent] to establish, by a fair preponderance of the evi-

dence, the material allegations of his complaint essential to a recovery, and in the event of recovery, the amount thereof.

"The burden is upon the defendants [appellants] to establish, by a fair preponderance of the evidence, the allegations of their affirmative defense."

Instruction No. 4. "You are further instructed that if you find from a preponderance of the evidence that a contract was entered into between the parties hereto for the sale of said inn, and that in pursuance to such contract the defendants delivered the possession of said inn to the plaintiff and that the plaintiff accepted such possession, then your verdict will be for the plaintiff even though you find that certain details of said contract were yet to be carried out before the price became payable."

Instruction No. 5. "You are further instructed that where there is a contract to sell specific or ascertained goods, the title to them is transferred to the buyer at such time as the parties to the contract intend it to be transferred; and for the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Instruction No. 6. "You are instructed that a contract to sell goods is a contract whereby the seller agrees to transfer the property and goods to the buyer for a consideration called price; and a sale of goods is an agreement whereby the seller transfers the property in the goods to the buyer for a consideration called price. So, if you find by a preponderance of the evidence that the defendant Walter Noel, either personally or through his agents, if any, agreed to and did sell the said inn to the plaintiff and that said plaintiff took possession of said property, and that by some act of the defendant Walter Noel, or through his authorized agents, said defendant wrongfully repossessed said property against the will of the plaintiff, then in that event I instruct you that your verdict must be in favor of the plaintiff."

Instruction No. 7. "You are instructed that a contract to sell such property as is included in this controversy in which the value exceeds $50.00 shall not be enforcible unless the buyer shall accept part of the goods so contracted to be sold and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless a note or memorandum in writing of the contract or sale be signed by the party to be charged, or his agent.

"You are further instructed that there is an acceptance of goods, within the meaning of the foregoing instruction, when the seller places the property at the disposal of the purchaser and relinquishes to the purchaser the control and right of control of, or dominion over the property, and the purchaser takes or accepts the control or right of control or dominion over the property."

Instruction No. 8. "You are instructed that if you find by a preponderance of the evidence that the title to the inn passed from the defendant Walter Noel to the plaintiff, then in that event it was unlawful for the defendant Walter Noel to repossess said property without authority and against the will of plaintiff. In determining whether title passed from one party to the other, you may ascertain the intention of the parties in considering the terms of the agreement of the contract for the purchase and sale of said property, if there was a contract, and the conduct of the parties, the custom of the trade, and all other circumstances that might throw light upon the intention of the parties."

Instruction No. 9. "You are instructed that if you find by a preponderance of the evidence that the plaintiff entered into an oral agreement with the defendant Walter Noel, or through the agent of Walter Noel, or a combination of the defendant Walter Noel and his agent, for the purchase of the inn, and by reason of said agreement the said plaintiff took possession of said inn and other personal property therein, but that the defendant Walter Noel, either personally or through his agents, if any, wrongfully repossessed and deprived the plaintiff of said property, then in that event I instruct you that your verdict must be for the plaintiff and you should award him such damages as would reasonably compensate him in accordance with the instruction hereinafter given you."

Instruction No. 10. "If your verdict is for the plaintiff, the measure of damages will be the difference between the market value of said inn and appurtenances at the time of the sale to Genevieve Aiken and the amount which the plaintiff agreed to pay for said property."

■ Since the appellants did not except to any of these instructions nor propose any additional instructions, the instructions given by the trial court became the law of the case. *Pepperall v. City Park Transit Co.*, 15 Wash. 176, 45 Pac. 743, 46 Pac. 407; *Dyer v. Middle Kittitas Irr. Dist.*, 40 Wash. 238, 82 Pac. 301; *Sexsmith v. Brown*, 61 Wash. 164,

112 Pac. 337; *Schatz v. Heimbigner,* 82 Wash. 589, 144 Pac. 901; *Bullis v. Ball,* 98 Wash. 342, 167 Pac. 942; *Peters v. Union Gap Irr. Dist.,* 98 Wash. 412, 167 Pac. 1085; *Risdon v. Hotel Savoy Co.,* 99 Wash. 616, 170 Pac. 146; *Kane v. Lindsey,* 143 Wash. 61, 254 Pac. 461; *National Ass'n of Creditors v. Grassley,* 159 Wash. 185, 292 Pac. 416; *Frich v. Department of Labor & Industries,* 169 Wash. 282, 13 P. (2d) 67; *Smith v. Dahlquist,* 176 Wash. 84, 28 P. (2d) 262; *Lally v. Graves,* 188 Wash. 561, 63 P. (2d) 361; *Bracy v. United Retail Merchants,* 189 Wash. 162, 63 P. (2d) 491; *Miller v. Mohr,* 198 Wash. 619, 89 P. (2d) 807; *Scholz v. Leuer,* 7 Wn. (2d) 76, 109 P. (2d) 294; *Sumerlin v. Department of Labor & Industries,* 8 Wn. (2d) 43, 111 P. (2d) 603; *Miles v. Pound Motor Co.,* 10 Wn. (2d) 492, 117 P. (2d) 179; *Skeels v. Davidson,* 18 Wn. (2d) 358, 139 P. (2d) 301, 149 A. L. R. 225; *Codd v. New York Underwriters Ins. Co.,* 19 Wn. (2d) 671, 144 P. (2d) 234; *Yockey v. Department of Labor & Industries,* 21 Wn. (2d) 171, 150 P. (2d) 680.

In the case of *National Ass'n of Creditors v. Grassley, supra,* this court said: "As to the instructions complained of, no exceptions thereto were taken, and they, however erroneous, became the law of the case."

In the case at bar, no error is assigned upon the instructions and, therefore, for still stronger reason, do the instructions become the law of the case.

It will be observed that the issues submitted to the jury by the instructions of the court were whether the parties entered into a contract for the sale of the tavern; whether, in pursuance of such contract, the appellants delivered and the respondent accepted possession of the property; whether it was the intention of the parties that title to the property be transferred; whether, after such sale and delivery, Walter Noel, personally or through his agents, wrongfully repossessed himself of the property, against the will of the respondent; and what was the market value of the property at the time it was sold to Genevieve Aiken. Although there may have been a serious conflict in the evidence upon each of those issues, the evidence was ample to support a

finding in favor of the respondent as to each of them, and, consequently, ample to support the general verdict.

It is but proper to say that appellants' present counsel did not participate in the trial, nor take any part in the proceedings until after the rendition of the verdict. Moreover, we do not wish to be understood as inferring that if exceptions had been taken to the instructions, or if some additional instructions had been requested and refused, it would now be held that the trial court committed error. We express no opinion on such suppositional situations, but confine ourselves strictly to the circumstances presented by the record before us.

Since there was ample evidence to support the verdict, upon instructions which constituted the law of the case, the judgment is affirmed.

BEALS, C. J., JEFFERS, and GRADY, JJ., concur.

MILLARD, J. (concurring specially)—I prefer the statement to be that, in the absence of challenge to the instructions or failure to propose additional instructions, it will be conclusively presumed that the court correctly instructed the jury on questions of fact which are foreclosed by the verdict. I am less and less inclined to accept the statement that the instructions become the law of the case because of failure to challenge correctness of the instructions. I agree with the opinion with this reservation.

---

September 11, 1945. Petition for rehearing denied.

SIMPSON, J., dissents.